## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1)  **BARBARA BARRICK, as Special Administrator of the ESTATE OF BOBBY DALE BARRICK, deceased,** )<br><br>**Plaintiff,** )<br><br>**v.** )<br><br>(2)  **BOARD OF COUNTY COMMISSIONERS OF McCURTAIN COUNTY, OKLAHOMA,** )<br><br>(3)  **McCURTAIN COUNTY SHERIFF KEVIN CLARDY,** )<br><br>(4)  **DEPUTY MATTHEW KASBAUM,** )<br><br>(5)  **DEPUTY QUENTIN LEE,** )<br><br>(6)  **DEPUTY KEVIN STOREY, and** )<br><br>(7)  **WARDEN MARK HANNAH,** )<br><br>**Defendants.** ) | **Case No.**  CIV-23-129-GLJ<br><br>**JURY TRIAL DEMANDED**<br>**ATTORNEY LIEN CLAIMED** |

## <u>COMPLAINT</u>

Plaintiff Barbara Barrick ("Plaintiff"), as Special Administrator of the Estate of Bobby Dale Barrick ("Barrick" or "Decedent"), hereby brings the following causes of action against Defendants Board of County Commissioners of McCurtain County, Oklahoma ("BOCC"), McCurtain County Sheriff Kevin Clardy ("Clardy"), Deputy Matthew Kasbaum ("Kasbaum"), Deputy Quentin Lee ("Lee"), Deputy Kevin Story ("Story"), and Warden Mark Hannah ("Hannah," collectively "Defendants"), and alleges as follows:

<u>**PARTIES, JURISDICTION & VENUE**</u>

<u>**Barbara Barrick (Special Administrator of the Estate of Bobby Dale Barrick)**</u>

1.  Plaintiff Barbara Barrick is the wife of Bobby Dale Barrick, now deceased, and a resident of Tulsa County, Oklahoma.

2.  On March 30, 2022, in Tulsa County District Court Case No. PB-2022-327, Plaintiff was appointed as Special Administrator of the Estate of Bobby Dale Barrick (the "Estate") and was granted Letters of Special Administration authorizing her, *inter alia*, to prosecute the instant lawsuit.

<u>**Board of County Commissioners of McCurtain County, Oklahoma**</u>

3.  The Board of County Commissioners of McCurtain County, Oklahoma ("BOCC") is the chief administrative body for McCurtain County ("County"), a political subdivision of the State of Oklahoma.  BOCC's principal place of business is located in the City of Idabel, the county of seat of McCurtain County, Oklahoma.

4.  BOCC is obligated to conduct itself in a constitutional manner with respect to any action it takes and/or responsibility it discharges through the personnel of the McCurtain County Sheriff ("MCS").

5.  At all times during the arrest of Decedent on March 13, 2022, which ended Decedent's death, the County was responsible, *inter alia*, for preventing MCS deputies from using constitutionally excessive force upon Decedent, and for ensuring that any MCS deputies who were present for and/or participated in the arrest of Decedent took reasonable steps to protect Decedent from being subjected to constitutionally unreasonable/excessive force at the hands of any other law enforcement personnel.

6.  At all times relevant hereto, the County was responsible, *inter alia*, for supervising MCS's

creation and implementation of appropriate and lawful use of force policies and practices, and for ensuring that MCS was properly training and supervising its deputies and other personnel in such regard.

7. Pursuant to the prior rulings of this Court, BOCC is properly named in this lawsuit.

8. For example, in *Lynch v. Bd. of County Comm'rs of Muskogee Co.*, U.S. Dist. Ct. (E.D.Okla.) Case No. 16-CV-247-JHP, this Court held:

> [T]he sufficiency of any allegations against Muskogee BOCC are subject to the same analysis as if the allegations had been made against the Muskogee County Sheriff in his official capacity. *See Gilbreath v. Cleveland Co. Bd. of Co. Comm'rs*, 2012 WL 2683133 *8 (W.D.Okla.) (holding that "the sufficiency of the allegations against [the county sheriff] in his official capacity is subject to the same analysis as applicable to the Board [of County Commissioners]," and denying motion to dismiss § 1983 claim "based on an unconstitutional policy or practice"); *citing Dodds v. Richardson*, 614 F.3d 1185, 1202 (10th Cir. 2010); *Moran v. Unknown Nurse #1*, 2015 WL 9593622 *1 (N.D.Okla.) (holding "a suit against the sheriff in his official capacity if the same as naming the county").

> In its *Motion*, Muskogee BOCC argues that "in order for Plaintiffs to prevail on their § 1983 claims against the Board, they must show that an official policy or established custom of the Board caused the alleged constitutional rights violation." In *Du Bois v. Board of County Comm'rs of Mayes Co., Okla.*, 2014 WL 4810332 (N. D. Okla.), however, the court rejected the same argument now made by Muskogee BOCC, holding:

>> This Court's reading of *Meade* does not support BOCC's argument [that it is not a proper party to be sued under § 1983] because the facts in *Meade* are different than those presented here. In *Meade,* the plaintiff did not name the board of county commissioners*,* but named three individual Oklahoma County Commissioners as defendants. The plaintiff sought to hold the sheriff and those commissioners liable in their individual capacities under a theory of supervisory liability. In analyzing those claims, the Tenth Circuit held that, while the sheriff could be held individually liable in his supervisory capacity on the evidence presented, the commissioners could not be held liable for the deputies' alleged use of excessive force, because the board of county commissioners had no duty under Oklahoma law to hire, train, supervise, or discipline the county sheriffs or their deputies. In short, because the commissioners acting on the board had no responsibility for supervising and training deputies in the use of force, the commissioners could not be held liable **individually** under a supervisor liability theory.

While *Meade* would generally preclude a plaintiff from suing commissioners in their individual capacities for actions of sheriff's deputies, the court's holding in that case does not preclude a plaintiff from bringing a § 1983 municipal liability action against a county.  This reading of *Meade* is plain on its face and is consistent with the numerous Supreme Court and Tenth Circuit decisions that treat § 1983 official capacity claims and claims against a county, in the name of its board of county commissioners, as suits against the county.  Both types of suits are analyzed under the *Monell* framework, which requires the existence of a county policy that was the moving force behind a violation of federal rights.

The Court acknowledges that some state and federal decisions in Oklahoma have indicated that a board of county commissioners is not a proper defendant with respect to allegations against a county sheriff on civil rights claims arising out of incidents at a county jail.  These cases rely in part upon *Meade* which, as noted, involved a suit against individual commissioners, as opposed to claims against a county, sued in the name of the board.

In addition, the Court does not believe the foregoing authorities -- which rely in part upon ... an extension of *Meade* that appears inconsistent with its actual holding -- can be reconciled with other decisions of the Tenth Circuit and the Supreme Court, which plainly establish that a policy of a county sheriff in his final policymaking capacity is a county policy, such that a county may be  sued under § 1983 so long as such policy was the moving force behind a constitutional violation.

*Id.* at **6-7 (emphasis in original; internal citations omitted).  Muskogee BOCC has itself admitted that "the Sheriff's Department does not enjoy a separate legal existence from Muskogee County."

Here, **Plaintiffs' § 1983 claims implicate Muskogee County because they deal, in part, with the unconstitutional policies and practices of the Muskogee County Sheriff** -- a county official with "final policymaking authority." **Therefore, the Court finds that <u>it was statutorily proper for Plaintiffs to name Muskogee BOCC as a defendant</u>, and that <u>dismissal under F</u>ED.R.C<u>IV.P. 12(b)(6) based on an "improper party" argument would be inappropriate.</u>** *See* 19 O.S. § 4 (providing that "[i]n all suits or proceedings … against a county, the name in which a county shall … be sued shall be, 'Board of County Commissioners of the County of __'"); *DuBois*, 2014 WL 4810332 at **6-7 (holding that "[u]nder Oklahoma law, claims against a county must be brought by naming the board of county commissioners of that county").

*See Order* [Dkt. #60] in Case No. 16-CV-247-JHP (E.D. Okla., March 31, 2017), pp. 4-6

(emphasis added).

**McCurtain County Sheriff Kevin Clardy**

9.  Defendant Kevin Clardy is a resident of McCurtain County, Oklahoma.  Since 2016, Clardy has held the position of McCurtain County Sheriff.

10. At all times relevant to the claims asserted herein, Clardy was acting under color of state law.

11. Plaintiff's claims for relief in this *Complaint* are brought against Clardy in his official capacity as McCurtain County Sheriff.

12. "A claim against a government actor in his official capacity is essentially another way of pleading an action against the county … he represents." *Revilla v. Glanz*, 7 F.Supp.3d 1207, 1217 (N.D.Okla. 2014).

13. Thus, naming McCurtain County Sheriff Kevin Clardy in his official capacity in this action is the functional equivalent of suing McCurtain County. *Id.*; *Moran v. Unknown Nurse #1*, 2015 WL 9593622 *1 (N.D.Okla.) (holding "a suit against the sheriff in his official capacity is the same as naming the county"); *Lynch v. Bd. of County Comm'rs of Muskogee Co.*, U.S. Dist. Ct. (E.D.Okla.) Case No. 16-CV-247-JHP, Dkt. #22, p. 9 (in which the Board of County Commissioners of Muskogee County expressly conceded that the Muskogee County Sheriff "does not enjoy a separate legal existence from Muskogee County").

14. McCurtain County "may be held liable for an act it has officially sanctioned, **or** for the actions of an official with final policymaking authority." *Revilla v. Glanz*, 7 F.Supp.3d 1207, 1217 (N.D.Okla. 2014). *See also Lynch v. Bd. of County Comm'rs of Muskogee Co.*, U.S. Dist. Ct. (E.D.Okla.) Case No. 16-CV-247-JHP, Dkt. #60, p. 3.

15. As McCurtain County Sheriff, Clardy is a county "official with final policymaking

authority." *See id.* at 1218; *Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir. 1995).

16. Additionally, Clardy serves as Chairman of the McCurtain County Jail Trust Board of Trustees and, according to the official McCurtain County web page, "[h]as [the[ power and authority to operate the County Jail." *See* https://mccurtain.okcounties.org/offices/county-sheriff.

17. As reported in the McCurtain Gazette on or about December 2, 2021:

> In the recent interview, when asked about the jail trust, [McCurtain County Sheriff Kevin Clardy] said, by state law, the jail trust only manages financial aspects of the jail, [and] the sheriff does everything else.

> "State law states the sheriff has full control of the jail and its employees.  That's state law, but the jail trust is over all financial aspects of the jail," Clardy said.

> "The jail trust is set up, in my opinion, not the way state law says it should be, but the way it went into effect by the vote of the people.  The jail trust is over financial actions of the jail.  It's set up that way.  Always has been since 1998 when it went into effect."

18. The type of constitutional violations giving rise to Plaintiff's claims were a widespread and continuing problem at any agency or entity operated by, and/or under the authority of, McCurtain County Sheriff Kevin Clardy, including the McCurtain County Sheriff's Office and the McCurtain County Jail.

**Matthew Kasbaum**

19. Defendant Matthew Kasbaum is, upon information and belief, a resident of McCurtain County, Oklahoma.

20. At all times relevant hereto, Kasbaum worked at MCS, held the position of Deputy, and carried out the duties of such position (in whole or in part) at MCS.

21. At all times relevant hereto, Kasbaum was acting under color of state law.

**Quinton Lee**

22. Defendant Quentin Lee is, upon information and belief, a resident of McCurtain County, Oklahoma.

23. At all times relevant hereto, Lee worked at MCS, held the position of Deputy, and carried out the duties of such position (in whole or in part) at MCS.

24. At all times relevant hereto, Lee was acting under color of state law.

**Kevin Storey**

25. Defendant Kevin Storey is, upon information and belief, a resident of McCurtain County, Oklahoma.

26. At all times relevant hereto, Storey worked at MCS, held the position of Deputy, and carried out the duties of such position (in whole or in part) at MCS.

27. At all times relevant hereto, Storey was acting under color of state law.

**Mark Hannah**

28. Defendant Mark Hannah is, upon information and belief, a resident of McCurtain County, Oklahoma.

29. At all times relevant hereto, Hannah was employed as a Game Warden with the Oklahoma Department of Wildlife Conservation.

30. At all times relevant hereto, Hannah was acting under color of state law.

31. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1343 to secure protection of and to redress deprivations of rights secured by the Fourth Amendment to the United States Constitution as enforced by 42 U.S.C. §1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

32. The jurisdiction of this Court is also invoked under 28 U.S.C. §1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Fourth Amendment to the United States Constitution and 42 U.S.C. §1983.

33. Venue is proper under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

<u>FACTS</u>

34. On March 13, 2022, at approximately 7:30 p.m., Deputies Matthew Kasbaum and Quentin Lee were dispatched to Lori's Corner Store and Deli in Eagletown, Oklahoma.

35. According to the Investigative Narrative prepared by MCS Deputy Richard Williamson:

> Dispatch advised that the man [later identified as Decedent Bobby Barrick] had run through the back door of the store while contractors were working on the closed business. …[T]he suspect had broken the glass out of the front door and had run into the highway … attempting to stop a semi-tractor trailer in the road and had jumped onto a woman's car.  The woman in the car [then] drug the man [back] into the store parking lot.

> [*MCSO Investigative Supplement*, p. 3]  A short time later, Kasbaum was informed by dispatch that the contractors had been fighting with Barrick and that they now had Barrick tied up in the parking lot.

36. According to his statement, Kasbaum "arrived on the scene to find [Barrick] laying face down on the pavement completely 'Hog tied'[.]"  When Kasbaum "went to [Barrick] and handcuffed him to detain for investigation," he observed that Barrick's "wrist and feet [and] his hands were turning purple from the tightness of the straps."

37. Kasbaum's statement continues:

> As soon as Deputy Lee arrived just seconds behind me, he assisted me in removing the strapping and helped me get [Barrick's] pockets cleared with a pat down search and up to [Lee's] patrol unit.  While attempting to untie and identify [Barrick], comments were being made toward [Barrick by the vigilantes] regarding taking his money and kicking him in his head[.]  For [Barrick's] protection at that point, I

wanted to get him into the unit as quickly as possible to de-escalate the anger towards him from the large crowd around us. … Mr. Barrick was walked over and placed into the back seat of Deputy Lee's Caged unit and secured only by handcuffs at that point.

38.    Around this time, Game Warden Mark Hannah, who purportedly had been alerted by his neighbor that "there was a huge fight at Lori's Corner Store in Eagletown," arrived at the scene and asked Deputies Lee and Kasbaum if they needed any help.

39.    Kasbaum asked Hannah to attempt to locate the green Chevrolet 4x4 that had reportedly dropped Barrick off near Lori's Corner Store.  Hannah did as requested, but had no successful locating the truck.

40.    When Hannah returned to the scene, Kasbaum told him that EMS was "enroute to access [Barrick] as he appeared to be under the influence of some illicit substance."  According to Hannah:

> I could hear [Barrick] screaming and yelling inside the deputy's truck.  He was also causing the truck to rock back and forth.  Upon EMS arrival, Kasbaum and Lee asked me to assist them in getting [Barrick] **out** of the truck.  Once Kasbaum opened the door, [Barrick] was yelling "Help me!  They are going to kill me!"

41.    The statements that were later obtained from the officers and EMS personnel present at the scene provide differing accounts in describing the events that took place next.

42.    Kasbaum claims that when he opened the door, Barrick (whose hands were still securely cuffed behind his back) "spun his feet around and attempted to kick out of the door." Kasbaum, however, "was able to trap [Barrick's] feet using the door and [Kasbaum's] leg." After some repositioning, Kasbaum "pressed [his] upper body into [Barrick's] causing [Barrick] to go sideways into the floor of the truck," where Kasbaum "now had Mr. Barrick trapped in the door jam of the back seat[.]"

43. According to Deputy Lee's partially-completed *Response to Resistance* form, "It was reported by Sgt. Kasbaum that when he opened the door to the patrol unit, [the officers were] **not** going to let Barrick exit the vehicle," and the physical struggle that ensued was attributable to Barrick's attempt, "while handcuffed, to exit the patrol vehicle."

44. Despite the Kasbaum and Lee's claim that Barrick was disobeying law enforcement by attempting to exit Lee's vehicle, MCS Deputy Richard Williamson expressly noted in his *Investigator Supplement* that one of the MCS deputies, along with Warden Mark Hannah, "asked Barrick several times to exit the vehicle."

45. Similarly, though EMT Kaytlynn Powers said the officers told Barrick "to put his feet back in the vehicle" and were "try[ing] to push [Barrick] back in the vehicle," part-time fireman/part-time EMT Tate Casanova told a different story, relaying that "the law enforcement officers asked [Barrick] several times to peacefully **exit** the vehicle, to which [Barrick] yelled 'help' and 'they are trying to kill me' at EMS" as the officers "extracted [Barrick] from the vehicle."

46. Since arriving on the scene, Deputy Kasbaum's lapel camera had been turned on and recording the events of the evening.

47. Likewise, Deputy Lee had activated his lapel camera at the time of his arrival, and had been recording his conversations and interactions with various bystanders.

48. Moments after the deputies began to get physical with Barrick, however, all cameras were turned off.

49. According to Lee, "Kasbaum's video was disengaged **accidentally**," and Lee, who had turned his off before going to retrieve Barrick from the back of his vehicle, "did not engage his video when the active resistance by Barrick was happening."  Lee further stated that

Deputy Kevin Storey (who, immediately upon his arrival, reportedly observed Kasbaum, Lee, and Hannah already struggling with Barrick) "did not engage his video in whole during the active resistance."

50. Upon information belief, Kasbaum (or one of the law enforcement personal present) instructed the other officers to deactivate all cameras.

51. Upon information and belief, once all cameras were disengaged, Defendants Kasbaum and Lee tased Barrick (who was still in handcuffs) no fewer than four times and, with the assistance of Storey and Hannah, yanked Barrick out of the vehicle by his feet, causing him to fall face down on the parking lot.

52. Thereafter, Kasbaum, Lee, Storey, and Hannah dragged Barrick away from the truck, at which point Lee and Storey mounted Barrick's back, and Kasbaum and Hannah applied force to Barrick's lower extremities.

53. After Barrick was restrained in this manner, Defendants Kasbaum, Lee, Storey, and Hannah, any of them, or some combination thereof continued to use physical force in dealing with Barrick, including, without limitation, by:

   (a) Continuing to put substantial or significant pressure on Barrick's back while he was in a face-down prone position and handcuffed;

   (b) Continuing to sit and/or kneel on the posterior aspect of Barrick's torso;

   (c) Continuing to sit, kneel, lie, and/or otherwise place (his/their) body weight on Barrick's upper torso;

   (d) Contorting Barrick's body during the process of placing him in leg restraints, thus prevent Barrick from being able to lie completely prone on the ground;

   (e) Forcing Barrick's face into the ground;

(f)  Continuing to apply a chokehold or other neck restraint;

(g)  Otherwise restricting Barrick's ability to breathe;

(h)  Unreasonably using a baton to strike Barrick and/or to subject him to "pain compliance techniques";

(i)  Delivering no fewer than four "drive-stuns" to Barrick's body using a personal TASER weapon that is not registered with MCS and on which MCS does not train its deputies;

(j)  Using, attempting to use, and/or threatening to use pepper spray on Barrick; and

(k)  Otherwise physically abusing Barrick.

54. Further, Defendants Kasbaum, Lee, Storey, and Hannah ignored Barrick's attempt at communicating that he was afraid that he was going to die and  to "Please don't kill me."

55. The use of force upon Decedent by the above-identified individuals, or any of them, was neither a good faith effort to restrain Decedent nor necessary to maintain control of Decedent.

56. EMT Candice Wyatt reported that while three of the above-named Defendants were lying on top of Barrick and another officer was applying additional restraints, Barrick stopped breathing.  Wyatt felt for a pulse and did not find one.  Barrick then experiences seizure like activity. He was subsequently transported to McCurtain Memorial.

57. Barrick was discharged from McCurtain Memorial via air Evac to Paris Regional Medical Center for a higher level of care on mechanical ventilation post respiratory arrest and cardiac arrest, where he ultimately died.

58. MCS has a long-standing culture and practice of disregarding its written policies.

59. MCS has a history of permitting its personnel to engage in unnecessary, unreasonable and excessive force on arrestees who pose no threat.

60. MCS employees have stated their resentment for members of the Native American community in a racial manner believing they receive special treatment.

61. MCS also has a long-standing culture, practice, and history of training and/or permitting its law enforcement officers to maintain secrecy and/or to falsify reports regarding such abuses.

62. The above-summarized acts and omissions were in furtherance of, and consistent with, the policies, customs, and practices that the McCurtain County Sheriff had previously created, implemented, observed, maintained, and/or tolerated (or in which MCS had otherwise previously acquiesced).

63. Whether formal or informal, the above-referenced policies, customs, and practices of the McCurtain County Sheriff (*i.e.*, McCurtain County) were well-settled and permanent.

64. The McCurtain County Sheriff (and thus McCurtain County) has a long, deep-seated history and unabated custom of excessive force.

### FIRST CAUSE OF ACTION:
### UNLAWFUL USE OF EXCESSIVE FORCE IN VIOLATION OF U.S. CONST., AMEND. IV
### (42 U.S.C. § 1983)

For her First Cause of Action, Plaintiff re-alleges and incorporates by reference all of the foregoing paragraphs, and further states:

65. The Tenth Circuit has "clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated [*e.g.*, handcuffed] constitutes excessive force." *Estate of Booker v.*

13

*Gomez*, 745 F.3d 405, 424 (10th Cir. 2014); *citing Weigel v. Broad*, 544 F.3d 1143, 1153 (10th Cir. 2008).

66. The *Booker* decision relies, in part, on the case of *Richman v. Sheahan*, 512 F.3d 876, 880 (7th Cir. 2008), which "warned [police] not to sit on the back of a person they are trying to restrain," since hypoxia "can also be induced by compressing the lungs, which the weight of several persons on one's back can do."

67. The *Booker* decision also relies on the case of *Drummond ex rel. Drummond v. City of Anaheim,* 343 F.3d 1052, 1059 (9th Cir. 2003), which held that the police, and "any reasonable person," should have known that squeezing the breath from a prone, handcuffed individual pleading for air "involves a degree of force that is greater than reasonable."

68. Additionally, the Tenth Circuit has recognized that when a suspect is "already handcuffed on the ground and subdued by multiple deputies," the application of a neck restraint, or the continued use of a TASER on the suspect, may constitute a disproportionate use of force. *Id.*; *citing McQuarter v. City of Atlanta, Ga.,* 572 F.Supp. 1401, 1414 (N.D.Ga. 1983) (use of chokehold was "excessive and malicious" when used after victim was "manacled" and "effectively restrained").

69. The Tenth Circuit has specifically addressed the dangers posed by TASER weapons, recognizing that the reasonableness of a particular use of force can often depend, in part, on whether law enforcement officers knew or should have known that an individual had special characteristics making him more susceptible to harm from the use of a particular type of force. *Aldaba v. Pickens*, 777 F.3d 1148, 1156 (10th Cir. 2015).

70. "A Taser sends up to 50,000 volts of electricity through a person's body, causing temporary paralysis and excruciating pain." *Casey v. City of Federal Heights,* 509 F.3d 1278, 1285

(10th Cir. 2007).

71. Notices issued by TASER International have warned law enforcement officers who use TASER weapons "to pay special attention" to "metabolically compromised" suspects, including those under the influence of drugs, "since their bodies are at a greater risk of harm from such devices."

72. Finally, the Tenth Circuit has expressly held that "officers may not apply the hog-tie technique when an individual's diminished capacity is apparent" due to the significantly increased risk of "positional asphyxiation." *Cruz v. City of Laramie*, 239 F.3d 1183, 1188 (10th Cir. 2001).

73. "In such situations, an individual's condition mandates the use of less restrictive means for physical restraint."

74. In *Cruz*, the Tenth Circuit expressed its understanding that a "hogtie" involves the binding of one's ankles and wrists behind the back, with twelve (12) inches or less of separation.

75. The same deadly effect may be achieved by holding a suspect's bound wrists against his waist, while simultaneously bending the suspect's legs at the knee at an angle less than 90 degrees (towards his waist), such that there remains a span of twelve inches or fewer separating the suspect's wrists from his ankles.

76. CLEET teaches that the application of the "hogtie" configuration on a suspect -- with or without using a chain or other fastening device to bind the suspect's wrists and ankles together – is prohibited.

77. By virtue of the aforementioned holdings, law enforcement personnel in the State of Oklahoma have been put on notice that utilizing any of the aforementioned techniques on a person who is restrained, handcuffed, no longer capable of meaningfully resisting, and/or

exhibiting signs of respiratory distress may constitute a disproportionate use of force, result in significant injury, including death, and be "unconstitutional under clearly established law." *Estate of Booker v. Gomez*, 745 F.3d 405, 428-29 (10th Cir. 2014).

78. After "drag[ging] Mr. Barrick … out from under the truck" and/or away from it, Defendants Kasbaum, Lee, Storey, and Hannah "kept [Barrick] face down on the pavement" and his wrists securely fastened in handcuffs behind his back.

79. After Barrick was restrained in this manner, Defendants Kasbaum, Lee, Storey, and Hannah, any of them, or some combination thereof continued to use physical force in dealing with Barrick, including, without limitation, by:

   (l)  Continuing to put substantial or significant pressure on Barrick's back while he was in a face-down prone position and handcuffed;

   (m) Continuing to sit and/or kneel on the posterior aspect of Barrick's torso;

   (n)  Continuing to sit, kneel, lie, and/or otherwise place (his/their) body weight on Barrick's upper torso;

   (o)  Contorting Barrick's body during the process of placing him in leg restraints, thus prevent Barrick from being able to lie completely prone on the ground;

   (p)  Forcing Barrick's face into the ground;

   (q)  Continuing to apply a chokehold or other neck restraint;

   (r)  Otherwise restricting Barrick's ability to breathe;

   (s)  Unreasonably using a baton to strike Barrick and/or to subject him to "pain compliance techniques";

   (t)  Delivering no fewer than four "drive-stuns" to Barrick's body using a personal TASER weapon that is not registered with MCS and on which MCS does not train

its deputies;

(u) Using, attempting to use, and/or threatening to use pepper spray on Barrick; and

(v) Otherwise physically abusing Barrick.

80. Further, Defendants Kasbaum, Lee, Storey, and Hannah ignored Barrick's attempt at communicating that he was afraid that he was going to die and  to "Please don't kill me."

81. Immediately upon encountering Barrick, Defendants Kasbaum, Lee, Storey, and Hannah each recognized Barrick's diminished capacity.

82. Defendants Kasbaum, Lee, Storey, and Hannah knew, or should have known, of Barrick's serious respiratory distress due to the manner in which they initially encountered him (*i.e.*, beaten and hogtied by the vigilante crowd).

83. The use of force on Barrick by Defendants Kasbaum, Lee, Storey, and Hannah was not a good faith effort to restrain Barrick or otherwise to maintain control.

84. Additionally or alternatively, the use of force on Barrick by Defendants Kasbaum, Lee, Storey, and Hannah was done maliciously, sadistically, and/or or the very purpose of causing harm to Barrick.

85. Defendants Kasbaum, Lee, Storey, and Hannah, or any of them, knew or should have known that the excessive physical force used against Barrick would result in Barricksuffering serious harm or death.

86. At the time Defendants Kasbaum, Lee, Storey, and Hannah used excessive physical force on Barrick, Barrick was no longer exhibiting any meaningful physical resistance to said Defendants.

87. At the time Defendants Kasbaum, Lee, Storey, and Hannah used excessive physical force on Barrick, Barrick was already restrained to such a degree that he was physically incapable

of meaningfully resisting said Defendants.

88.    At the time Defendants Kasbaum, Lee, Storey, and Hannah used excessive physical force on Barrick, there was no need for the application of such force.

89.    At the time Defendants Kasbaum, Lee, Storey, and Hannah used excessive physical force on Plaintiff, the threat to Defendants' safety posed by Plaintiff was minimal or nonexistent.

90.    At the time Defendants Kasbaum, Lee, Storey, and Hannah used excessive physical force on Plaintiff, Defendants did not reasonably perceive Plaintiff as posing some threat warranting the application of force.

91.    Defendants Kasbaum, Lee, Storey, and Hannah made no effort to temper the severity of a forceful response.

92.    Plaintiff unnecessarily suffered pain and death as a direct and proximate result of the force used by Defendants Kasbaum, Lee, Storey, and Hannah.

93.    In using force against Plaintiff as set forth above, Defendants Kasbaum, Lee, Storey, and Hannah were acting under color of state law.

94.    The acts in which Defendants Kasbaum, Lee, Storey, and Hannah each engaged were incidental to some service being performed for their employers.

95.    Alternatively, the acts in which Defendants Kasbaum, Lee, Storey, and Hannah each engaged arose out of an emotional response to actions being taken for their employers.

96.    Plaintiff is entitled to the recovery of damages in this case as a result of the forgoing acts and omissions on the part of Defendants Kasbaum, Lee, Storey, and Hannah.

**WHEREFORE**, for her First Cause of Action, Plaintiff Barbara Barrick prays that this Court enter judgment in her favor and against Defendants Kasbaum, Lee, Storey, and Hannah, and that it award Plaintiff all available pecuniary and non-economic damages in an amount exceeding

$2,000,000.00, or such other specific sum consistent with the evidence that Plaintiff anticipates will be presented in this case.  Plaintiff also prays for punitive damages against Defendants Kasbaum, Lee, Storey, and Hannah, prejudgment interest, the recovery from said Defendants of all attorney fees and costs reasonably incurred by Plaintiff in her prosecution of this action, and an award of all other relief (whether legal, equitable, or both) to which Plaintiff may be entitled and/or that this Court deems just and proper.

### SECOND CAUSE OF ACTION:
### FAILURE TO INTERVENE TO PREVENT OR STOP THE USE OF EXCESSIVE FORCE IN VIOLATION OF U.S. CONST., AMEND. IV
### (42 U.S.C. § 1983)

For her Second Cause of Action, Plaintiff re-alleges and incorporates by reference all of the foregoing paragraphs, and further states

97.   Defendants Kasbaum, Lee, Storey, and Hannah were each present at the scene to witness, and did, in fact, witness, one or more of the remaining three Defendants engaging in the use of unlawful, excessive, and constitutionally unreasonable force upon Decedent Bobby Barrick.

98.   Defendants Kasbaum, Lee, Storey, and Hannah each had a realistic opportunity to prevent one or more of the remaining three Defendants from using, or continuing to use, unlawful, excessive, and constitutionally unreasonable force upon Barrick.

99.   Nevertheless, Defendants Kasbaum, Lee, Storey, and Hannah each failed to take reasonable steps to protect Barrick from the use of excessive force by one or more of the remaining three Defendants.

100.  Plaintiff is entitled to the recovery of damages in this case as a result of the forgoing acts and omissions on the part of Defendants Kasbaum, Lee, Storey, and Hannah.

**WHEREFORE**, for her Second Cause of Action, Plaintiff Barbara Barrick prays that this Court enter judgment in his favor and against Defendants Kasbaum, Lee, Storey, and Hannah, and that it award Plaintiff all available pecuniary and non-economic damages in an amount exceeding $2,000,000.00, or such other specific sum consistent with the evidence that Plaintiff anticipates will be presented in this case. Plaintiff also prays for punitive damages against Defendants Kasbaum, Lee, Storey, and Hannah, prejudgment interest, the recovery from said Defendants of all attorney fees and costs reasonably incurred by Plaintiff in her prosecution of this action, and an award of all other relief (whether legal, equitable, or both) to which Plaintiff may be entitled and/or that this Court deems just and proper.

### THIRD CAUSE OF ACTION
#### *MONELL* LIABILITY FOR CONSTITUTIONAL VIOLATIONS
#### (42 U.S.C. § 1983)

For her Third Cause of Action, Plaintiff re-alleges and incorporates by reference all of the foregoing paragraphs, and further states:

101. The above-referenced constitutional violations to which Decedent was subjected were in furtherance of, consistent with, and causally connected to the policies, customs, and practices that BOCC/MCS had previously created, implemented, observed, maintained, and/or tolerated (or in which BOCC/MCS had otherwise previously acquiesced).

102. Such policies, customs, and/or practices include those set forth hereinabove.

103. Whether formal or informal, the aforementioned policies, customs, and practices of BOCC/MCS were well-settled and permanent at the time of the events upon which Plaintiff's claims are based.

104. Furthermore, the above-referenced constitutional violations to which Decedent was subjected arose under circumstances that constitute usual and recurring situations with

which MCS deputies and personnel must routinely deal and/or have regularly or previously dealt.

105. BOCC/MCS failed to adequately train, supervise, and/or control MCS deputies and personnel regarding their obligations under the Fourth Amendment to refrain from using force that is constitutionally excessive, unreasonable, and/or disproportionate under clearly-established Tenth Circuit law.

106. BOCC/MCS failed to adequately train, supervise, and/or control MCS deputies and personnel regarding their obligations under the Fourth Amendment to protect suspects and arrestees from being subjected to constitutionally excessive, unreasonable, and/or disproportionate force at the hands of other law enforcement personnel.

107. A direct and causal link exists between the pain and death unnecessarily suffered by Decedent Bobby Barrick and the failure by BOCC/MCS to adequately train MCS deputies and personnel.

108. Upon information and belief, BOCC/MCS had prior knowledge that the type of constitutional violations addressed hereinabove were a widespread and continuing problem at any agency or entity operated by, and/or under the authority of, McCurtain County Sheriff Kevin Clardy, including the McCurtain County Sheriff's Office and the McCurtain County Jail.

109. BOCC/MCS had actual and/or constructive notice that its actions and/or failures to act, as described herein, were substantially certain to result in the violation of the constitutional rights of anyone arrested, detained, or incarcerated in McCurtain County, including Decedent.

110. Moreover, given the above-described history of constitutional violations, which is lengthy

and ongoing, the need to provide MCS deputies with more and/or different training was obvious to BOCC/MCS, as was the likelihood that the aforementioned inadequacies would result in violations of the constitutional rights of arrested, detained, or incarcerated in McCurtain County, including Decedent.

111. Nevertheless, BOCC/MCS consciously or deliberately chose to disregard the substantial risk of serious harm to which MCS deputies were subjecting those individuals who have been (or would in the future be) arrested, detained, or incarcerated in McCurtain County., including Decedent.

112. BOCC/MCS, through its continued encouragement, ratification, approval, and/or maintenance of the aforementioned policies, customs, and/or practices, in spite of their known and obvious inadequacies and dangers, has been deliberately indifferent to the health and safety of those individuals who have been (or would in the future be) arrested, detained, or incarcerated in McCurtain County., including Decedent.

113. As a direct and proximate result of the aforementioned customs, policies, and/or practices, Decedent suffered pain, injury, and death, as alleged herein, entitling Plaintiff to recover damages.

**WHEREFORE**, premises considered, Plaintiff Barbara Barrick prays for judgment against Defendants Board of County Commissioners of McCurtain County, Oklahoma, and McCurtain County Sheriff Kevin Clardy for all available damages (including pecuniary and non-economic damages) in an amount exceeding $2,000,000.00, or such other specific sum consistent with the evidence that Plaintiff anticipates will be presented in this case.  Plaintiff also prays for pre-judgment interest, attorney fees, and the costs of this action, to be taxed against said

Defendants, along with an award of all other relief (whether legal, equitable, or both) to which

Plaintiff may be entitled and/or that the Court deems just and proper.

**Respectfully submitted:**

**CAMP LAW FIRM**

**By:** _____

**Christopher L. Camp, OBA #18541**
**7122 South Sheridan Road, Suite #2-382**
**Tulsa, Oklahoma 74133**
**Telephone: (918) 200-4871**
**Facsimile: (918) 340-6799**
**E-mail: camplawfirm@gmail.com**


**and**


**GARRETT LAW**

**By:** **/s/ D. Mitchell Garrett, Jr.**_____
**D. Mitchell Garrett, Jr., OBA# 20704**
**320 South Boston Avenue, Suite 825-G**
**Tulsa, Oklahoma 74103**
**Telephone: (918) 221-6190**
**Facsimile: (918) 340-6799**
**E-mail: mitchell@garrettlawcenter.com**

**Attorneys for Plaintiff Barbara Barrick**