IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| BARBARA BARRICK, as Special Administrator of the ESTATE OF BOBBY DALE BARRICK, deceased, <br><br> Plaintiff, <br><br> v. <br><br> DEPUTY MATTHEW KASBAUM, DEPUTY QUENTIN LEE, and WARDEN MARK HANNAH, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. CIV-23-129-JFH-GLJ |

## REPORT AND RECOMMENDATION

Plaintiff Barbara Barrick ("Plaintiff"), as special Administrator for the Estate of Bobby Dale Barrick ("Barrick"), deceased, sued the Sheriff of McCurtain County, Oklahoma, McCurtain County Sheriff's Office ("MCSO") Deputies Matthew Kasbaum, Quentin Lee, and Kevin Story, as well as Oklahoma Game Warden and Cross-Deputized Choctaw Nation Tribal Police Officer Mark Hannah. Plaintiff originally alleged various Fourth Amendment violations pursuant to 42 U.S.C. § 1983, as well as municipal liability as to the Sheriff of McCurtain County. All remaining Defendants now move for summary judgment. For the reasons set forth below, the undersigned Magistrate Judge finds that the Motion for Summary Judgment and Brief in Support of Defendants Matthew Kasbaum and Quentin Lee [Docket No. 165] and Defendant Mark Hannah's Motion for Summary Judgment and Brief in Support [Docket No. 167] should be GRANTED.

I. PROCEDURAL HISTORY

Plaintiff filed this case on April 23, 2023 [Docket Nos. 1-2] against the above-named Defendants.[1] The Court referred this case to the undersigned Magistrate Judge for all further proceedings in accordance with jurisdiction pursuant to 28 U.S.C. § 636 on September 5, 2023 [Docket No. 41]. On November 7, 2023, Defendant Mark Hannah moved for judgment on the pleadings [Docket No. 67], which this Court ultimately denied [Docket Nos. 91 & 99].

At the close of discovery, the Sheriff and Defendants Kasbaum, Lee, Storey, and Hannah moved for summary judgment [Docket Nos. 164-167]. Plaintiff only responded to the motions by Kasbaum and Lee [Docket No. 165] and Hannah [Docket No. 167].[2] Despite repeated extensions of time [Docket Nos. 174-175, 178-179], Plaintiff never responded to the motions by the Sheriff [Docket No. 164] and Storey [Docket No. 166]. The Sheriff and Storey therefore filed a Joint Motion to Deem Confessed their motions for summary judgment [Docket No. 185] to which Plaintiff never responded.

Considering the novel issue raised by the individual defendants in their motions, the undersigned Magistrate Judge set the motions for oral argument, which was held on June 11, 2025 [Docket Nos. 218-221]. At the hearing, Plaintiff agreed to dismiss all claims

---

[1] Plaintiff also named the Board of County Commissioners of McCurtain County, Oklahoma, which has since been dismissed from the case. *See* Docket Nos. 2, 22, 48, 50. Additionally, the Sheriff of McCurtain County was substituted for Defendant McCurtain County Sheriff Kevin Clardy, in his official capacity. *See* Docket Nos. 207-208, 210.

[2] Plaintiff's original responses to these motions was stricken for failure to comply with this Court's Local Rules, Administrative Guide, and the Stipulated Protective Order in place [Docket Nos. 188-190].

against the Sheriff and Defendant Storey with prejudice and a stipulation of dismissal with prejudice as to these parties was filed the same day [Docket No. 222]. The motions for summary judgment as to the Sheriff and Storey [Docket No. 164, 166] have now been denied as moot considering the stipulation of dismissal [Docket No. 223].

## II. LEGAL STANDARD

Summary judgment is appropriate if the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party must show the absence of a genuine issue of material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), with the evidence taken in the light most favorable to the non-moving party, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). However, "a party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute[.]" Fed. R. Civ. P. 56(c).

## III. BACKGROUND

The undisputed facts reflect a series of events on March 13, 2022, in Eagletown, Oklahoma, located in the Eastern District of Oklahoma. Around 4:30 a.m., Kasbaum, a Sergeant with the MCSO, responded to a call to help Barrick, whose truck was stuck in some mud. Barrick appeared under the influence of something, but was functional and cooperative, and Kasbaum did not arrest Barrick for being intoxicated because Barrick's

vehicle was immobilized. Docket No. 165, p. 10, ¶ 1. Later that day, Barrick was dropped off at Lori's Corner Store in Eagletown, which is within the boundaries of the Choctaw Reservation. The store was closed, but contractors were working inside when Barrick ran in the back door; they chased him as he broke the glass of the front door and ran onto Highway 70, where he got into a semi-tractor trailer rig occupied by its driver. Despite Barrick's instructions, the truck driver shut down the rig, so Barrick got out of the truck cab and ran back to a car occupied by a woman and her children. Barrick punched at her window, grabbed onto the side view mirror, and jumped onto the car as she was driving. Throughout these events, Barrick made statements about someone or multiple people trying to kill him. *Id.*, pp. 10-11, ¶¶ 2-7; Docket No. 167, p. 10, ¶ 1 & pp. 12-13, ¶¶ 15-18. The woman drove her car, with Barrick still on top, back into the Lori's Corner Store parking lot, where the contractors hog-tied Barrick with his hands behind his back and his ankles bound together. Docket No. 165, p. 11, ¶ 8.

Upon notice of this incident, the MCSO dispatched Kasbaum and Lee to the scene at Lori's Corner Store, which was 35-40 miles away from the MCSO. On the way to the scene, the officers also called for EMS services. *Id.*, p. 12, ¶¶ 9-11. Kasbaum and Lee arrived around 7:27 p.m., at which time they saw Barrick had been hog-tied. *Id.*, ¶ 13. Barrick was yelling for help, and again declaring, "They're going to kill me!" *Id*, p. 13, ¶ 13. Kasbaum and Lee handcuffed Barrick and removed the other bindings, and Barrick was able to stand and talk with the officers. *Id.*, ¶¶ 14-15. Kasbaum then requested EMTs to respond to the scene. *Id.*, ¶ 16. Officers located Barrick's Choctaw Nation Membership

Card in his pocket. *Id.*, p. ¶ 17. Kasbaum and Lee were cross-commissioned officers with the Choctaw Nation. *Id.*

Hannah became involved in the incident after a neighbor informed him of a fight happening at Lori's Corner Store. Hannah worked as an Oklahoma Game Warden but was also a Tribal Police Officer of the Choctaw Nation who held a Special Law Enforcement Commission ("SLEC") Card from the Bureau of Indian Affairs and was a certified CLEET instructor. Docket No. 167, ¶¶ 10-11, ¶¶ 3-5. Kasbaum and Lee arrived in MCSO vehicles, wearing clothing that identified them with the MCSO, and Hannah arrived in a state vehicle wearing his Game Warden uniform displaying the Game Warden insignia. Docket No. 204, pp. 30-32, ¶¶ 109, 118-119,124-125.

Before Hannah arrived, Kasbaum and Lee had placed Barrick in Lee's patrol vehicle, then all three later attempted to remove him to be seen by EMS. Though the parties disagree on specific details, Barrick was noncompliant with officers, continuing to struggle with them as they attempted various methods to subdue him, including screaming, yelling, and rocking back and forth. Docket No. 165, pp. 14-16. During the continued altercation, Barrick fell unconscious, at which time the EMTs on site assessed him and transported him to McCurtain Memorial Hospital, where he was placed on a ventilator. He was later transferred to Paris Regional Medical Center, where he ultimately died. Barrick's cause of death was listed as acute respiratory failure due to acute kidney injury. Contributing factors included bipolar disorder, schizophrenia, and hypertension. *Id.*, p. 20, ¶¶ 45-45.

## IV.    ANALYSIS

Defendants each raise numerous legal and factual arguments for summary judgment in their favor, but the first and primary argument by the remaining individual Defendants is that Kasbaum, Lee, and Hannah were not acting under color of state law. Plaintiff disagrees and contends that the individual officers were acting under color of state law. As set forth below, the undersigned Magistrate Judge finds that Kasbaum, Lee, and Hannah were not acting under color of state law when they responded to this incident and attempted to place Barrick in custody.

It has long been held that "[s]tate courts generally have no jurisdiction to try Indians for conduct committed in 'Indian country.'" *McGirt v. Oklahoma*, 591 U.S. 894, 898 (2020) (citing *Negonsott v. Samuels*, 507 U.S. 99, 102-103 (1993)); *see also Ross v. Neff*, 905 F.2d 1349, 1353 (10th Cir. 1990) ("The Supreme Court has expressly stated that state criminal jurisdiction in Indian country is limited to crimes committed 'by non-Indians against non-Indians . . . and victimless crimes by non-Indians.'") (quoting *Solem v. Bartlett*, 465 U.S. 463, 465 n. 2 (1984) (citing to 18 U.S.C. § 13)). The Supreme Court's decision in *McGirt* more recently held that the Creek Nation reservation had never been disestablished. *Id.* at 914. Since then, the Supreme Court recognized that the Cherokee, Choctaw, Chickasaw, and Seminole reservations were likewise not disestablished. *See Oklahoma v. Castro-Huerta*, 597 U.S. 629, 633-634 (2022) (citations omitted). The events in this case occurred in Eagletown, Oklahoma, which is in McCurtain County, Oklahoma, and is simultaneously within the boundaries of the Choctaw Reservation. As noted above, Barrick was a registered member of the Choctaw Nation.

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. . . .

42 U.S.C. § 1983. "A claim pleaded under § 1983 requires (1) deprivation of a federally protected right by (2) an actor acting under color of state law." *VDARE Found v. City of Colorado Springs*, 11 F.4th 1151, 1160 (10th Cir. 2021) (internal quotation marks omitted). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed[3] with the authority of state law." *Schaffer v. Salt Lake City Corp.*, 814 F.3d 1151, 1156 (10th Cir. 2016) (internal quotation marks omitted) (noting this determination "is a mixed question of fact and law"). In other words, the purpose of § 1983 is to "provide compensatory relief to those deprived of their federal rights by state actors." *Felder v. Casey*, 487 U.S. 131, 141 (1988). Accordingly, "[a] § 1983 action is unavailable 'for persons alleging deprivation of constitutional rights under color of tribal law.'" *Burrell v. Armijo*, 456 F.3d 1159, 1174 (10th Cir. 2006) (quoting *R.J.*

---

[3] Though Plaintiff asks the Court to read the term "clothed" literally, such an interpretation is not necessarily supported by case law, as discussed further below. *See, e.g.*, *David v. City & Cnty. of Denver*, 101 F.3d 1344, 1353 (10th Cir. 1996) ("The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty."); *see also Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir. 1975) ("It is the nature of the act performed, not the clothing of the actor . . . which determines whether [a public official] has acted under color of law.") (quotation omitted), *cert. dismissed,* 429 U.S. 118 (1976).

*Williams Co. v. Ft. Belknap Hous. Auth.*, 719 F.2d 979, 982 (9th Cir. 1983)); *see also Delebreau v. Danforth*, 743 Fed. Appx. 43, 45 (7th Cir. 2018) ("[B]ecause the purpose [of] section 1983 is to enforce the Fourteenth Amendment, and Indian tribes are 'distinct sovereignties' not addressed by that Amendment, they are beyond the statute's reach.") (citation omitted). Importantly, acting "'under color of state law' [is] a jurisdictional requisite for a § 1983 action[.]" *Polk County v. Dodson*, 454 U.S. 312, 315 (1981); *see also Sanchez v. Surratt*, 682 Fed. Appx. 679, 680-681 (10th Cir. 2017) (remanding case for further development on whether Defendant acted under color of state law because "constitutional avoidance points to determining the state-actor issue before the qualified-immunity issue[.]"); *Sturdivant v. Blue Valley Unified Sch. Dist.*, 2019 WL 2297517, at *3 (D. Kan. May 30, 2019) ("Defendant Porter moves to dismiss the amended complaint because it does not plausibly allege that she acted under color of state law for purposes of § 1983. In the alternative, defendant Porter moves to dismiss on qualified immunity grounds—an issue that the court declines to address because it grants defendant Porter's motion on the 'under color of state law' issue.").

Acting under color of state law as a jurisdictional prerequisite is not, however, to be confused with the question of whether an officer must have jurisdiction to be acting under color of state law. Defendants Kasbaum, Lee, and Hannah argue that, absent their individual cross-commissions, *see* Docket No. 165, Ex. 2, pp. 177 ln. 22 - 178, ln. 14 & Ex. 21; No. 167, Ex. 6,[4] they did not have jurisdiction to arrest Barrick. The parties

---

[4] These exhibits to the briefing contain Cross Commission cards for Kasbaum and Hannah, as well as Storey, *see* Docket No. 165, Ex. 20, but not for Lee. Lee's sworn deposition testimony,

disagree, however, as to whether the officers must have jurisdiction to act under color of state law. Previous case law seems to indicate that jurisdiction is not required, and that state officers acting outside their own jurisdiction may nevertheless be acting under color of state law, including executing extra-jurisdictional traffic stops. *See Swanson v. Town of Mount View, Colo.*, 577 F.3d 1196, 1203-1204 (10th Cir. 2009) (traffic stops outside on-duty officer's municipal jurisdiction but within the same state did not constitute unlawful seizure).

Indeed, pointing to a 1970 Supreme Court decision, Plaintiff notes the Supreme Court's holding that even private citizens can be liable for § 1983 violations when they are involved *in a conspiracy* with state officials. *Adickes*, 398 U.S. at 152 ("[A] private party involved in such a conspiracy, even though not an official of the State, can be liable under s 1983."). Importantly, however, the basis for this finding is where the individual "is a willful participant in joint activity with the State or its agents[.]" *Id.* (quotation omitted). None of the individual Defendants here are private citizens; rather, they are county and state law enforcement officers who have each been cross-commissioned as officers of the Choctaw Nation Tribal Police. The appropriate question under this rubric, then, is whether the officers were willful participants in joint activity with state actors/agents, or willful participants in joint activity with the Choctaw Nation or its agents.

Many § 1983 cases prior to *McGirt* addressed the question of defining "color of

---

however, states that he received his cross-commission card shortly after he was hired in January 2022. There is no apparent dispute that Lee was a cross-commissioned officer on March 13, 2022, at the time he encountered Barrick with Kasbaum, Storey, and Hannah.

state law," but none in this specific context. Earlier cases were largely occupied with determining whether the actor was a private citizen or acting as a state officer, *see, e.g.*, *Adickes*, 398 U.S. at 150, or whether the state officer was on tribal *or* state land, *see, e.g.*, *Ross*, 905 F.2d at 1352. In this case, all three officers were authorized as state officers as well as tribal officers, and the land in Eagletown falls *both* within Oklahoma's state jurisdiction *and* Choctaw Reservation boundaries. Prior case law indicates that tribal officials are considered agents of the state "*only* if they act jointly with, under the direction of, or on behalf of the government." *Ouart v. Fleming*, 2010 WL 1257827, at *7 (W.D. Okla. Mar. 26, 2010) (emphasis added) (citing *Romero v. Peterson,* 930 F.2d 1502, 1507 (10th Cir. 1991) (applying the same rule to determine if a tribal officer could be a federal actor for purposes of a *Bivens* action)). By this same token, the undersigned Magistrate Judge posits that state officials become agents of a Tribal authority if they act jointly with, under the direction of, or on behalf of the Tribe, here, the Choctaw Nation.

In seeking answers to the questions posed by this case, the undersigned Magistrate Judge considered whether an officer's jurisdictional authorization based on his status as a cross-commissioned officer removes all authority as a state actor or agent, or whether he retains that state authority while also exercising Tribal authority, *i.e.*, whether officers may wear only one "hat" at a time, or wear two "hats" simultaneously. The undersigned Magistrate Judge finds that the question is one of primacy, not numerosity. Justice Kavanaugh noted recently that "Indian country is part of a State, not separate from a State." *Castro-Huerta*, 597 U.S. at 652. "As this [Supreme] Court has phrased it, a State is generally 'entitled to the sovereignty and jurisdiction over all the territory within her

limits.'" *Id.* at 636 (quoting *Lessee of Pollard v. Hagan*, 44 U.S. 212, 228 (1845). Notably, though, "federal law may preempt that state jurisdiction in certain circumstances." *Id.*

Plaintiff contends the officers can and did wear two hats at the time of the incident with Barrick, emphasizing that all three arrived in their county or state uniforms/regalia and in county or state vehicles. But "[t]he under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty." *David v. City & Cnty. of Denver*, 101 F.3d 1344, 1353 (10th Cir. 1996). And even in cases cited by Plaintiff, "it is only when the sheriff exercises power granted by the state that his actions become state actions." *Hall v. Witteman*, 569 F. Supp. 2d 1208, 1221 (D. Kan. 2008) (citing *Norton v. Liddel*, 620 F.2d 1375, 1379-1380 (10th Cir. 1980)). Plaintiff cites *Hall* for the proposition that "lack of actual state authority is not determinative," *id.* at 1222, but fails to acknowledge the context: "[m]isuse of power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law." *Id.* (quoting *Monroe v. Pape*, 365 U.S. 167, 184 (1961), *overruled on other grounds by Monell v. Dep't of Soc. Servs. of New York,* 436 U.S. 658 (1978)) (quotation omitted)). This rubric is most applicable in distinguishing private action from state action, *i.e.*, in the context of a sheriff using the prestige of his office to endorse a candidate, *Hall*, 569 F. Supp. 2d at 1222 (holding such action was private conduct, not misuse of office), or where election commissioners falsely counted and certified a ballot, *United States v. Classic*, 313 U.S. 299, 307, 325-326 (1941) (held this was action under color of state law) (*affirmed in Monroe*, 365 U.S. at 187); *see also Screws v. United States*,

-11-

325 U.S. 91, 111 (1945) ("[A]cts of officers in the ambit of their personal pursuits are plainly excluded. Acts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it.").

The overriding question here, however, is whether the officers were acting under color of tribal law or state law, or both, *i.e.*, *which* official duties take precedence. Previous Tenth Circuit holdings state that, "one must examine 'the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties.'" *David*, 101 F.3d at 1353 (quoting *Martinez v. Colon*, 54 F.3d 980, 986 (1st Cir. 1995)). This appears to be an incomplete statement of the law for our context when the issue is not whether an officer's conduct is related to official duties but rather which official duties the officer's conduct falls under. Plaintiff concedes that Kasbaum, Lee, and Hannah were not *solely* acting under color of state law, considering their individual statuses as cross-commissioned officers of the Choctaw Tribal Police Force. Rather, Plaintiff contends that their *appearances* as state officers by uniform and state-issued vehicles, continues to qualify them as acting under state law despite their jurisdiction deriving from Choctaw Tribal authority. *See, e.g.*, *Griffin v. State of Maryland*, 378 U.S. 130, 135 (1964) (privately employed deputy sheriff had been acting as a state actor rather than amusement park employee where he "wore a sheriff's badge and consistently identified himself as a deputy sheriff rather than as an employee of the park" and "purported to exercise the authority of deputy sheriff" when he ordered petitioners to leave the park, then arrested and instituted prosecutions against them). Again, however, that is an easier question when

attempting to distinguish between state and private action, as opposed to state or tribal authority.

Ultimately, in following *Ross*, *McGirt* and *Castro-Huerta*, the determinative factor here is Barrick's status as a member of the Choctaw Nation.  *See Nevada v. Hicks*, 533 U.S. 353, 362 (2001) ("[T]he principle that Indians have the right to make their own laws and be governed by them requires 'an accommodation between the interests of the Tribes and the Federal Government, on the one hand, and those of the State, on the other.'") (quoting *Washington v. Confederated Tribes of Colville Reservation,* 447 U.S. 134, 156 (1980)).  Because Barrick was a tribal member, Kasbaum, Lee, and Hannah only had jurisdiction to act as law enforcement officers against him because they were cross-commissioned officers of the Choctaw Nation Police Force, and in doing so they were exercising authority possessed by virtue of Choctaw Nation law.  Despite the uniforms they were wearing, the law is clear that any law enforcement authority over Barrick on reservation land is derived from the Choctaw Nation, not the State of Oklahoma.[5]

Accordingly, the undersigned Magistrate Judge finds Kasbaum, Lee, and Hannah were acting under Tribal authority, and Plaintiff cannot maintain a viable claim against

---

[5] In the criminal context and as a practical matter, this question is frequently not resolved until after a defendant has been taken into custody and processed.  Once a defendant's tribal status is determined, the defendant is then either retained by the State or forwarded to the appropriate Tribal authority based on that status.  This process leads many to view the analysis as retroactive and adds to the arguments that the officers are wearing two jurisdictional hats at once.  In truth, however, the timing of the assessment does not affect the authority that existed at the time the events occurred.  The undersigned Magistrate Judge finds that while any formal assessment may be retroactive, the questions of jurisdiction and "color of law" can and should be addressed on the facts at the time of the incident and that an officers' legal status *in this context* exists apart from the officers' subjective understanding of the basis for their authority at any given time.

them pursuant to § 1983. *See Burrell*, 456 F.3d at 1174 ("A § 1983 action is unavailable for persons alleging deprivation of constitutional rights under color of tribal law.") (quotation omitted); *see also Hicks*, 533 U.S. at 362 ("'When on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest.'") (quoting *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 144 (1980)); *Jojola v. Chavez,* 55 F.3d 488, 492-493 (10th Cir. 1995) ("[P]rivate conduct that is not fairly attributable to the State is simply not actionable under § 1983, however discriminatory or wrongful the conduct is. . . . [T]he fact that a tort was committed by an individual employed by the state does not, *ipso facto,* warrant attributing all of the employee's actions to the state.") (internal quotation marks omitted); *Holtz v. Oneida Airport Hotel Corp.*, 826 Fed. Appx. 573, 575 (7th Cir. 2020), *reh'g denied* (Nov. 10, 2020) ("When they are enforcing tribal laws or managing tribal affairs, neither tribal officers *and agents* nor private corporations act under color of state law.") (emphasis added). Neither Kasbaum, Lee, nor Hannah were exercising power "possessed by virtue of state law and made possible only because the [alleged] wrongdoer is clothed with the authority of state law." *United States v. Classic,* 313 U.S. 299, 326 (1941).

Furthermore, because acting under color of state law is a jurisdictional prerequisite, *Polk County*, 454 U.S. at 315, the undersigned Magistrate Judge recommends that Defendants' Motions for Summary Judgment be granted on this basis and declines to address Defendants' qualified immunity arguments. *Accord Sturdivant*, 2019 WL 2297517, at *3.

The undersigned Magistrate Judge is acutely aware that the above findings may have far-reaching implications for tribal citizens in the Eastern District of Oklahoma,[6] every square inch of which continues to be reservation land. The correct legal conclusion here carries the implication that tribal members in the Eastern District of Oklahoma have fewer constitutional civil rights protections than non-tribal members, and leaves no check on the actions of cross-commissioned state officers[7] who encounter tribal members. When asked, Defendants' counsel were unable to articulate potential alternative remedies and admitted they had not considered these implications. As a result, the undersigned Magistrate Judge is mindful of Judge Gorsuch's concluding words in *McGirt*: "In reaching our conclusion about what the law demands of us today, we do not pretend to foretell the future and we proceed well aware of the potential for cost and conflict around jurisdictional boundaries, especially ones that have gone unappreciated for so long."  591 U.S. at 936. The undersigned Magistrate Judge likewise urges, however, that pessimism should not "rule the day," noting there are many avenues for resolution including statutory amendments (federal, state, and/or Tribal) and possibly intergovernmental agreements, *id.* at 936-937, although those questions will be left for resolution at a later time.

## CONCLUSION

Accordingly, the undersigned Magistrate Judge hereby RECOMMENDS that

---

[6] This is not to mention the Northern District of Oklahoma, which likewise contains large swaths of reservation land coterminous to the State of Oklahoma.

[7] The undersigned Magistrate Judge declines to speculate whether Plaintiff would have had a viable § 1983 claim against the individual Defendants had they *not* been cross-commissioned, as that question is not before the Court.

Motion for Summary Judgment and Brief in Support of Defendants Matthew Kasbaum and Quentin Lee [Docket No. 165] and Defendant Mark Hannah's Motion for Summary Judgment and Brief in Support [Docket No. 167] be GRANTED. Any objections to this Report and Recommendation must be filed within fourteen days. *See* 18 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Any objections and response shall each be limited to 10 pages and a reply is permitted only with leave of court upon a showing of good cause.

**DATED** this 9th day of July, 2025.

_____
**GERALD L. JACKSON**
**UNITED STATES MAGISTRATE JUDGE**